# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| ANTHONY WHITNEY NORMAN, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-13-0624 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| *Respondent*. | § | |

## MEMORANDUM OPINION AND ORDER

State inmate Anthony Whitney Norman filed a section 2254 habeas petition challenging his murder conviction.  Respondent filed a motion for summary judgment (Docket Entry No. 52), to which petitioner filed a response (Docket Entry No. 56, 66, 70).  Petitioner also filed cross motions for summary judgment (Docket Entries No. 57, 60, 67, 69, 71).

Based on consideration of the pleadings, the motion and response, cross motions, the record, and the applicable law, the Court GRANTS the motion for summary judgment, DENIES the cross motions for summary judgment, and DISMISSES this case for the reasons that follow.

### *Procedural Background and Claims*

Petitioner was convicted of murder and sentenced to twenty-two years imprisonment.  The conviction was affirmed on direct appeal.  *Norman v. State*, No. 14-11-00433-CR (Tex. App.–Houston [14th] 2012, pet. ref'd).  The Texas Court of Criminal Appeals denied

discretionary review, and denied petitioner's purported application for state habeas relief. *Ex parte Norman*, WR-76,389-02. Petitioner filed five applications for mandamus relief with the Texas Court of Criminal Appeals over the ensuing five months, all of which were denied.

Petitioner filed the instant federal habeas petition on March 6, 2013, raising the following claims for relief:

1.   The evidence is insufficient to support the conviction because petitioner was out of town at the time of complainant's death.

2.   The grand jury was tainted because

   (a)   the State lied to the grand jury;

   (b)   the State failed to turnover exculpatory evidence;

   (c)   the prosecutor testified during the grand jury presentation;

   (d)   the indictment was secured by fraud on the court; and

   (e)   the jury failed to act independently of the prosecutor.

3.   Petitioner was denied his right to counsel of his choice.

4.   The trial court erred in allowing into evidence statements made by petitioner during investigative interviews.

5.   The prosecution erred in introducing out-of-record arguments as evidence, including vouching for the credibility of witnesses; shifting the burden of proof; lying to the jury; arguing that the defense was lying; and stating that petitioner and another witness were liars.

6.   The trial court erred in failing to

   (a)   control closing arguments by the State;

2

      (b)     exclude audio and video evidence, thereby forcing petitioner to testify against himself;

      (c)     exclude from evidence the grand jury record;

      (d)     exclude hearsay evidence;

      (e)     grant a directed verdict; and

      (f)     prevent the prosecution from misrepresenting witnesses' testimony.

Respondent argues that these claims are without merit.

### *Factual Background*

The intermediate state court of appeals set forth the following statement of facts in its

opinion affirming petitioner's murder conviction:

> Appellant was convicted of murdering his twenty-five-year-old wife, Leydis Viche Hernandez, on December 1, 2008 at their house in Houston. Appellant met Leydis in her native country, Cuba, when she was about twenty-years old. Shortly thereafter, Leydis moved to Houston, and the couple married. At the time of Leydis's death, they had three young children, including a two-week-old infant. As we will discuss, the State presented evidence that appellant was physically and verbally abusive and domineering toward Leydis.

> It is undisputed that appellant and the couple's four-year old son were in the Dallas area for part of the weekend immediately before Leydis was found dead early on a Monday morning. [FN] Leydis remained home with their infant son and three-year-old daughter. According to appellant, he stayed with his brother, Marcus Norman, in McKinney while performing construction work on a project they jointly owned.

>> [FN] Appellant did not testify at trial, but the State presented recordings and transcripts of his statements to investigating officers and grand-jury testimony. Our references to appellant's accounts of various facts and his claims regarding Leydis's death (other than contentions in his appellate brief) are gleaned from his statements to officers and grand-jury testimony. To the

3

extent there were internal inconsistencies in appellant's accounts, we recite the version most favorable to the verdict because the jury was free to believe that version. Appellant asserted that he left Marcus's home after 11:00 p.m. on Sunday night, arrived home shortly after 5:00 a.m., found Leydis dead on the kitchen floor, and called 9-1-1 within fifteen minutes. In contrast, the State contended appellant arrived home earlier and killed Leydis.

In any event, appellant did call 9-1-1 at 5:12 a.m. According to the State's evidence, EMTs and officers with the Harris County Sheriff's Department arrived at various times. They found Leydis dead on the kitchen floor, lying in a pool of blood with what the medical examiner later described as a 'perforating' gunshot wound to the head, inflicted from a gun pressed against the skin. Leydis was naked except for wearing mismatched men's socks, with one placed on 'sideways.' Near the body was a diaper bag containing typical baby items as well as nine one-ounce gold bars. A semi-automatic Glock pistol, which undisputedly was owned by appellant, lay near Leydis's feet. A casing, which forensic experts determined was fired from the Glock pistol, was on the kitchen counter. A bullet projectile was recovered from sheetrock in the breakfast-room ceiling, but testing was inconclusive on whether it was fired from the Glock pistol. In the couple's upstairs master bedroom was a box for a gun with the make, model, and serial number of the Glock pistol. The upstairs master bedroom and bathroom were soaked with water, which caused the garage ceiling below to partially collapse and damaged a common wall between the living room and the garage. The shower floor and garden bath in the master bathroom were wet, and a robe and female undergarments were on the floor. Two lamps on the interior wall of the living room were unplugged, as though someone sought to avoid electrical shock or damage to the lamps. It was not immediately clear to officers whether the death was suicide, accidental, or homicide. However, the medical examiner ultimately classified the death as a homicide.

The first responding officer, Deputy Ben Katrib, encountered appellant standing in the garage holding the infant, and the older children were in their upstairs bedrooms. At the scene, appellant consented to testing of his hands for gunshot residue. Deputy Katrib placed bags on appellant's hands to preserve any residue, secured the bags with handcuffs, and placed appellant in a patrol car, but he was not under arrest. The handcuffs were eventually removed. Sergeant Henry Palacios, a homicide investigator, then asked

4

appellant to accompany him to the homicide-division office in Sergeant Palacios's vehicle, to give a statement. Appellant obliged and was also not under arrest at that time. During the ride, Sergeant Palacios and appellant engaged in conversation, which was partially audio recorded. Appellant was at the homicide office for approximately six hours while Sergeant Palacios and Sergeant Eric Clegg conducted an interview, which was partially audio and video recorded, and administered a polygraph test, but again appellant was not under arrest. Appellant eventually terminated the interview and left the office.

As we will further discuss, the State presented evidence that appellant engaged in threatening, abusive, and aggressive behavior towards officers that day. In these statements, appellant claimed Leydis accidently shot herself. Subsequently, appellant's aggressive behavior continued, and he was uncooperative in Sergeant Palacios's investigation or suggested various theories that a third party killed Leydis.

Approximately four months after Leydis's death, Sergeant Palacios asked another homicide investigator, Sergeant Craig Clopton, to obtain an additional statement because of a 'breakdown in communication' between Sergeant Palacios and appellant. Sergeant Clopton requested that appellant come to the homicide office, but he insisted they meet at his home. On April 1, 2009, Sergeant Clopton and two other officers video and audio recorded a 'walk-through' of the home, while appellant explained his actions when he purportedly found Leydis's body. The officers then took an additional statement from him. In late May 2009, appellant informed Sergeant Clopton he found another spent shell casing at his home. Sergeant Clopton collected the casing from the floor of the upstairs laundry room, and forensics experts determined it was fired from the Glock pistol.

In January 2010, appellant testified before a grand jury relative to investigation of Leydis's death. Shortly thereafter, the grand jury indicted appellant for murder. A jury found appellant guilty and assessed punishment of twenty-two years' confinement.

*Norman*, slip op., at *1–7 (citations omitted).

### *The Applicable Legal Standards*

*Habeas Review*

This petition is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U .S.C. § 2254.  Under the AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  *Harrington v. Richter*, ___U.S. ___, 131 S. Ct. 770, 785 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent.  *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409.  In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable.  *Id.* at 411.

The AEDPA affords deference to a state court's resolution of factual issues.  Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding.  *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003).  A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31.

*Summary Judgment*

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact.  *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing habeas proceedings.  Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed

facts must be construed in the light most favorable to the nonmovant.  Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, the state court's findings must be accepted as correct by the federal habeas court.  *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

### *Insufficiency of the Evidence*

Petitioner claims that the evidence is insufficient to support his conviction for murder.

In rejecting petitioner's claim on direct appeal, the intermediate state court of appeals found as follows:

> [A]ppellant contends the evidence is legally insufficient to support his conviction and the trial court erred by denying his motion for an instructed verdict.  We address a challenge to the denial of a defendant's motion for instructed verdict as a challenge to legal sufficiency of the evidence.  When reviewing sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt.  We do not sit as the thirteenth juror and may not substitute our judgment for that of the fact finder by re-evaluating weight and credibility of the evidence.  Rather, we defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts.

> This standard applies equally to both circumstantial and direct evidence.  Circumstantial evidence is as probative as direct evidence and alone can be sufficient to establish guilt.  Each fact need not point directly and independently to the defendant's guilt, as long as the cumulative effect of all incriminating facts is sufficient to support the conviction.  Our duty as reviewing court is to ensure the evidence presented actually supports a conclusion that the defendant committed the crime.

A person commits murder if he 'intentionally or knowingly causes the death of an individual' or 'intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.' TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2011).  The gist of appellant's contentions is that the State failed to prove Leydis's death was a murder, the State failed to prove appellant committed the murder or possessed the requisite culpable mental state, and he had an alibi.

      A.     Proof that death was a murder

On appeal, appellant suggests Leydis committed suicide because she was suffering from post-partum depression.  However, in his statements to officers, appellant emphasized Leydis would not have committed suicide and claimed the death was accidental:  she heard a noise downstairs while running water upstairs, went downstairs with her infant and the gun to investigate, and accidently shot herself.

Regardless, the jury could have reasonably concluded Leydis did not shoot herself, purposely or accidently.   Forensic testing or officers' testimony established the following: there was no gunshot residue on Leydis's right hand (she was right-handed, according to appellant); a lone particle of residue on her left hand was characterized as 'negative' or 'inconclusive' because many more particles will be present when a wound is self inflicted and the lone particle could have resulted from secondary transfer; blood-drop patterns on Leydis's body were inconsistent with a self-inflicted gunshot wound; and blood splatter on her right arm was consistent with her raising the arm in an attempt to push the gun away.

Further, witnesses characterized Leydis as a devoted mother, who seemed excited to show off her new baby on the weekend of her death—attitudes inconsistent with suicidal behavior.  Moreover, the jury could have rationally rejected the proposition that Leydis left water running with her three-year-old daughter upstairs and ventured downstairs naked with her infant and a gun to confront a possible intruder, instead of calling the police, much less that she would have pointed the gun toward her own head.

Rather, the jury could have determined, as argued by the State, that appellant staged the scene to support his accidental-death claim.  The fact the gun was found near Leydis's feet indicated it was deliberately placed there to present an appearance the wound was self-inflicted.  The fact that lamps on the

water-damaged living-room wall were unplugged in an apparent attempt to avoid electrocution or damage to the lamps supported an inference that water was intentionally left running in order to stage an accident scene—whether Leydis truly was running water and appellant left it running after the murder; or whether he turned on the water to stage the scene.

      B.     Evidence that appellant committed the murder

The jury could have reasonably concluded that appellant murdered Leydis, based on the couple's tumultuous relationship and appellant's treatment of Leydis, physical evidence, lack of evidence to support appellant's alibi, evidence negating involvement of any other person, and appellant's actions and statements after the murder.

      1.     The couple's relationship

Leydis was not fluent in English and financially depended on appellant, who was fifteen years her senior.  After appellant withheld financial support in 2007, Leydis began working as a dancer at gentlemen's clubs, which admittedly upset appellant when he discovered this fact.  In 2007, he was also disturbed to discover she was using cocaine.  That year, each spouse filed for divorce.  During divorce proceedings, Leydis moved into an apartment and had brief relationships with two men she met at the gentlemen's clubs.  Appellant and Leydis reconciled later that year, and she returned home.

Several of the State's witnesses testified about the couple's tumultuous relationship.  Kathleen Bunge and Vanessa Castillo, who befriended Leydis during 2007, and Michael Munivar and Edward Jacobson, with whom Leydis had the romantic relationships, used various terms to describe Leydis's feelings about her marriage: 'not happy'; 'cage[d]'; 'trapped'; 'sheltered'; and 'manhandled.'  These persons also witnessed appellant's abusive behavior or evidence of such abuse.  Bunge saw bruises and 'finger' or 'claw' marks on Leydis.  At times, Leydis approached Bunge and was crying because she feared appellant.  Leydis told Castillo that appellant 'abuse[d],' 'hit,' and 'tied . . . up and beat' her.  Castillo saw scars on Leydis's arms and legs.  Leydis once left Castillo a voicemail, which consisted of 'screaming like [Leydis] needed help.'  When Castillo further inquired, Leydis said she and appellant had argued but she was fine.  On one occasion, when Castillo drove Leydis to retrieve her children from appellant, he threw the daughter's shoe out of Castillo's car in anger.  According to Munivar, appellant once appeared at the

gentleman's club where Leydis was working, was 'loud,' 'obnoxious,' and disruptive, and yelled at Leydis, who seemed submissive. Munivar also described an incident in which appellant 'pound[ed]' on the door of Leydis's apartment for at least forty-five minutes, yelling, 'open this fucking door,' but she did not comply.

Additionally, the couple's neighbor, Mary Ortiz, met Leydis while Leydis was walking in the subdivision. Leydis said her husband 'kicked' her out and she had 'no place to go.' [FN3] Ortiz called the police who advised that Leydis, as an owner, could legally enter the home, so Leydis broke a window to gain access. After the officer left, appellant arrived home, retrieved a gun, and entered the home. Mrs. Ortiz then heard screaming from the home and called the police. Mrs. Ortiz and her husband saw frequent altercations between appellant and Leydis, involving volatile behavior by both spouses, and the police were called multiple times. On one occasion when Helen Grace, an employee of Leydis's divorce attorney, accompanied Leydis to the courthouse, she became 'very nervous and kind of in a frenzy' when she saw appellant, seemed frightened of him, and wanted to prevent him from following her home.

> FN3. As appellant notes, the trial court sustained appellant's hearsay objection regarding Leydis's statements to Ortiz. However, Ortiz had already relayed the contents of the statements and appellant did not request an instruction to disregard; therefore, the evidence was before the jury for consideration.

Further, some of these witnesses described how appellant was threatened by their relationships with Leydis. At one point, appellant appeared at Bunge's home, which surprised her, because she had just moved in and did not know how he could have discovered her address. Appellant had surveillance equipment, knew information about Bunge's family and her social security number, accused Bunge of having a sexual relationship with Leydis, and mentioned numerous persons with whom Leydis was purportedly having a sexual relationship. Appellant offered Bunge $1,000–1,200 to refrain from seeing Leydis again, which Bunge accepted. During phone conversations, appellant threatened Munivar to stay away from Leydis and commented, 'you don't know who the fuck you're dealing with. You're messing with the wrong fucking person. I can find you.' Appellant sent Jacobson phone calls and text messages, instructing him to refrain from seeing Leydis. Mrs. Ortiz eventually

terminated her friendship with Leydis because appellant threatened Mrs. Ortiz and her children.

Appellant acknowledged the couple's past marital problems but denied he was abusive. Rather, he characterized Leydis as volatile, spoiled, and a heavy spender until he curtailed her allowance and emphasized he worked hard to provide her with 'nice' material possessions. Appellant also claimed the relationship was 'great' after they reconciled and Leydis had started 'acting right.' To the contrary, the State's evidence indicated the relationship remained troubled and the abuse continued. Leydis told Jacobson she reconciled with appellant only for the sake of her children and requested Jacobson to resume their relationship, but he declined. After Leydis and appellant reconciled, Castillo sometimes visited Leydis at the couple's home. During one visit, Leydis, who was five or six-months pregnant (*i.e.*, about three months before her death) had a cut on her eyebrow 'like she had been hit.'

Moreover, appellant admitted he tried unsuccessfully to call Leydis from the Dallas area several times over the weekend just before her death and during his trip home, which the jury could have inferred reminded appellant of the previous year when he did not know Leydis was working in gentlemen's clubs and she had broken away from him. Appellant also admitted he was irritated when he arrived home that Leydis had left in the driveway a nice bicycle he bought for her. Further, the gold bars in the diaper bag supported an inference Leydis planned to leave appellant or otherwise was hiding valuables from him; appellant acknowledged picking up the diaper bag, albeit purportedly to feed the infant after finding Leydis's body. These factors individually might not establish a motive to kill Leydis; and, as the State argued, the jury would never know exactly what transpired in the home that morning because the evidence was circumstantial. However, these factors, together with all the evidence, supported an inference appellant was angry when he arrived home and his controlling nature and mindset that Leydis was unappreciative surfaced, resulting in the altercation leading to her death.

### 2.  Physical evidence

Moreover, physical evidence supported a finding that appellant murdered Leydis. The jury could have determined that appellant's Glock pistol was used in the killing, considering the spent shell casing found on the counter was fired from this gun. Testing revealed Leydis was the major contributor to DNA

12

found on the grip of the pistol and appellant and/or one or more of the couple's sons were the other (minor) contributor[s]. The jury could have concluded that the four-year-old and infant sons did not handle the gun; thus, this DNA evidence indicated no person other than appellant was involved in the death. Additionally, this DNA evidence, coupled with the absence of gunshot-residue on Leydis's hands, indicated she touched the gun while attempting to protect herself and/or, after the murder, appellant tried to stage a self-inflicted wound by attempting to place the gun in Leydis's hand or at least transferring her DNA to the gun. [FN4] We recognize appellant's hands tested negative for gunshot residue, but a forensics witness testified residue is easy to remove.

> FN4. The State cites evidence demonstrating Leydis was a contributor to DNA obtained from scrapings under her fingernails and asserts appellant was the other contributor, thereby indicating the couple struggled. However, the DNA expert could not exclude one or more of the couple's sons as the other contributor. The medical examiner agreed the scrapings could test positive for the children's DNA by virtue of Leydis caring for them. Nonetheless, as we have explained, the blood spatter evidence raised an inference there was a struggle, to the extent Leydis attempted to protect herself by pushing the gun away; and the DNA on the gun grip was probative to the extent it either further confirmed a struggle or indicated that appellant staged a self-inflicted wound.

### 3. Appellant's Alibi

Appellant has continually claimed Leydis died while he was in the Dallas area or traveling to Houston. Appellant claimed that he left Marcus's home after 11:00 p.m. on Sunday night, stopped at a Sonic in McKinney, stopped at a gas station, stopped at the first rest station south of Dallas where he slept from 1:00 a.m. to 3:00 a.m., and then continued to Houston, arriving home shortly after 5:00 a.m., in order to attend a 6:00 a.m. business appointment.

Appellant asserted the following transpired when he arrived home: after driving into the garage, he noticed water damage on the ceiling; he left his son in the car while he entered the house from the garage; he saw Leydis's body on the kitchen floor with their infant lying next to her; he pushed on Leydis's chest to determine if she were alive; he made a bottle for the infant; he called for his three-year-old-daughter who appeared at the top of the stairs and told

13

her to return to bed; he took his four-year-old son upstairs; he turned off running water in the master bathroom sink and shower; he checked Leydis's cell phone for battery life; and, at some point, he called 9–1–1—within fifteen minutes after arriving home.

Appellant further emphasized that, when he arrived home, Leydis's body was in full rigor mortis, which, according to appellant, takes twelve hours to set in and he heard one EMT remark Leydis had been dead at least twelve hours.  In his appellate brief, appellant asserts that the EMT testified he detected full rigor mortis and the medical examiner opined Leydis died four to six hours before her body was found.  Therefore, appellant contends the State's own evidence proved appellant's alibi—she died before 1:00 a.m., and he could not have been in Houston at that time.

However, at trial, the EMT denied making any statement regarding time of death and testified he lacked expertise to make such a determination.  Further, the EMT testified he detected some rigor mortis in one arm when he checked for a pulse but did not determine full body rigor mortis.  Additionally, the medical examiner did not testify Leydis died four to six hours before she was found.  Rather, when explaining that onset of rigor mortis is a variable process relative to determining time of death, the medical examiner testified she has seen instances of rigor mortis four to six hours after a death.

The medical examiner further explained that, absent an eyewitness, it is difficult to determine time of death with complete accuracy.  However, examining glucose levels may be useful because it is typically metabolized out of the body within twenty-four hours after death, subject to certain variables. The level of glucose can be determined only by examining vitreous fluid in the eyes.  During the autopsy (28 hours after the body was found), the medical examiner found a very low level of glucose.  Based on this traceable level, the medical examiner opined Leydis died 'fairly close' to—no more than 'a few hours' before—the time her body was found.  Significantly, Mrs. Ortiz testified she heard a 'bang' at approximately 4:00 a.m. on Monday morning.

Evidence verified that appellant indeed traveled south from McKinney to Houston on Sunday night and into Monday morning:  in appellant's car, officers found a receipt for a Sonic in McKinney dated 11:19 p.m. on Sunday night and appellant's cell phone records reflected he made calls at 12:40 a.m. and 12:41 a.m. near Ennis—south of Dallas.  However, there was no evidence substantiating appellant's claim that he stopped at the first rest station south of

14

Dallas from 1:00 a.m. to 3:00 a.m. Sergeant Palacios visited the station, which was located in Corsicana—south of Ennis, but it lacked recording equipment to verify appellant's presence.  Further, appellant made no other calls that morning, which might document his whereabouts, until he later phoned 9–1–1. Sergeant Palacios calculated the distance from the rest station to appellant's home as 180 miles and at least 160 miles was via interstate.  Because no evidence substantiated appellant stopped at the rest station at 1:00 a.m., the jury could have concluded that, driving at least 160 miles at a typical interstate speed and another twenty miles at typical city speeds, appellant arrived home within the window of time Leydis died (according to the medical examiner) and certainly by 4:00 a.m. (when Mrs. Ortiz heard the 'bang').

> 4.   Theories that a third person killed Leydis

Despite his initial statements claiming the death was accidental, appellant subsequently provided the following claims to investigating officers and/or the grand jury:  Leydis was killed by Michael Munivar, Ed Jacobson, or 'J.D. Tran,' the son of appellant's neighbor, because Leydis rejected his romantic overtures; Leydis feared both Munivar and Jacobon; appellant's daughter told him 'Ed' killed Leydis; and later the daughter indicated that she saw Leydis die while fighting over a gun with a woman, whom appellant claimed was Vanessa Castillo, and the woman then undressed the body.

The jury could have reasonably rejected these theories.  At trial, Munivar, Jacobson, and the neighbor's son, who was actually named 'Ed Harris,' all denied killing Leydis, Harris denied making any romantic overtures to Leydis, and the jury was free to believe their testimony.  EMTs who assumed care of the children at the scene testified the toddlers did not speak about Leydis's death or appear traumatized, thereby negating appellant's claim that his daughter saw 'Ed' or Castillo kill Leydis.  The blood pool under Leydis's body was undisturbed, negating appellant's claim that his daughter saw Castillo undress the body after allegedly killing Leydis.  There was no indication of any conflict between Leydis and any of these alleged suspects at the time of her death.  Castillo testified Leydis had a good relationship with Munivar and Jacobson and did not fear either man.  There was no evidence of forced entry—when officers arrived, the front and back doors of the home were locked and deadbolted, and the doors from the garage to the home and the garage to the outside, through which appellant and officers had passed, were undamaged.  Even appellant asserted the door from the garage to the home was locked when he arrived home.  Mrs. Ortiz looked out her window after hearing

the 'bang' but noticed nothing unusual on the cul-de-sac or any unfamiliar vehicles.  Finally, it is a rational inference that an intruder would not have left the gun at the scene.

> 5.    Appellant's actions and statements after Leydis's death

Moreover, numerous actions and statements of appellant were inconsistent with a husband who was shocked and bereaved over his wife's death or otherwise demonstrated consciousness of guilt: appellant showed, for the most part, lack of emotion over the death, behaved in an aggressive, threatening, or abusive manner towards persons investigating the death, attempted to deflect attention from himself, and made incredible claims regarding the death and surrounding circumstances.

Specifically, when the first responding officer, Deputy Katrib, encountered appellant standing in the garage holding the infant, appellant seemed 'very calm,' just motioned toward the house, and stated, 'she['s] inside.'  After Deputy Katrib visually inspected inside the house and returned outside, appellant insisted that Deputy Katrib cover Leydis's body with a blanket. When Deputy Katrib calmly explained such action would contaminate the scene, appellant became belligerent and called Deputy Katrib a 'fucking asshole,' 'idiot cop,' and 'ignorant.'  When Deputy Katrib expressed concern about the infant, who was underdressed for the cold weather, appellant responded with additional cursing.  When Deputy Katrib approached appellant to bag his hands and preserve any gunshot residue, appellant was speaking via phone to his brother Marcus (an attorney).  Appellant again cursed at Deputy Katrib and told Marcus, 'I've got an asshole cop standing in front of me.' When Deputy Katrib placed appellant in the patrol car, appellant said, 'You better watch out because I will find you.  If you touch me, I will sue the shit out of you.'

When Sergeant Palacios approached appellant at the scene, he was 'very aggressive.'  Similarly, during the interview later at the homicide office, appellant eventually became 'very agitated and very aggressive.'  Only a day after the death, appellant called Sergeant Palacios, was 'very hostile,' and demanded the homicide office immediately close the case.  Over the next week, appellant called the sheriff's office twenty-eight times, insisting the case be closed or providing names of various suspects, but none of this information proved helpful.  Appellant remained uncooperative with Sergeant Palacios

during the investigation.  Appellant continually threatened to, and did indeed eventually, sue the sheriff's department.

When appellant accompanied Sergeant Palacios to the homicide office after Leydis's body was found, he immediately said, 'I don't want [the coroner] taking out her eyes.'  This statement confused Sergeant Palacios at the time but supports an inference appellant had researched that glucose levels obtainable only from eye fluid can be utilized to determine time of death.  Appellant admittedly researched information regarding rigor mortis—the phenomenon on which he heavily relied to support his alibi claim.

Appellant not only advanced various implausible theories, such as accidental death or murder by one of the persons mentioned above, but he also changed his theories over time and even involved his three-year-old daughter as a witness in some of the claims.

Appellant failed to claim Leydis's body until thirty days after the autopsy, which the medical examiner considered unusual, considering the couple was married and had children together.  After claiming the body, appellant did not hold a funeral.

At one point, appellant requested a meeting with medical-examiner personnel because he was dissatisfied with the progress of the investigation.  The personnel requested that Sergeant Palacios or other officers attend the meeting because the personnel were intimidated by, and feared, appellant.

During grand-jury proceedings, appellant insisted the sheriff's department was retaliating against him for lodging complaints against Sergeant Palacios and suing the department.  Appellant also made aggressive and insulting remarks to the prosecutor and accused her of misleading the grand jury.

Appellant's claimed actions after allegedly returning home and discovering Leydis's body were inconsistent with having found one's spouse dead of a gunshot wound; *i.e.*, that appellant would have performed any actions before immediately calling 9–1–1, taken his four-year-old son into the home, where danger might exist, or left both toddlers in the home while waiting outside for the police.

17

> Finally, with respect to the culpable mental state, the fact that appellant shot Leydis in the head at close range supported the finding he 'intentionally or knowingly' caused her death.
>
> In summary, the evidence is legally sufficient to support appellant's conviction for murder.

*Davis*, at *2–*9 (state case citations omitted).

For purposes of a sufficiency challenge under section 2254, the evidence is not given discrete "legal" and "factual" sufficiency challenges.  Rather, a challenge to the sufficiency of the evidence supports a claim for federal habeas relief only if the evidence, viewed in the light most favorable to the State, is such that no reasonable fact finder "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The *Jackson* standard allows the trier of fact to find the evidence sufficient to support a conviction even if the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence. *Gilley v. Collins*, 968 F.2d 465, 468 (5th Cir. 1992).

The intermediate state court of appeals reviewed the sufficiency of the evidence under the *Jackson* standard and found the evidence sufficient to support the conviction.  Petitioner has not presented evidence in this habeas petition that overcomes the deference due to the state appellate court's decision with respect to sufficiency of the evidence.  Nor has he explained how the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law.  Petitioner further fails to explain how the state court's decision was based on an unreasonable determination of the facts in light of the

18

evidence presented.  Although petitioner presented the jury with an alternate interpretation of the evidence suggesting that the complainant shot herself or was the victim of a third-party shooting, the jury was free to accept or reject that defense and weigh the evidence as it saw fit. In this case, as explained by the state appellate court, there was sufficient evidence by which the jury could have rejected petitioner' alternative theories.

Moreover, this Court has made an independent review of the record and finds that the evidence is sufficient to support petitioner's conviction.  In support of his insufficiency of the evidence claim, petitioner does little more than re-assert the defense's arguments and theories that the jury soundly rejected at trial.  The jury was not obligated to believe petitioner's assertions of being out of town at the time complainant died, and his persistence in asserting this purported alibi to the Court here affords him no grounds for relief under AEDPA.

The state court denied relief on this claim.  Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, federal law, or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

### *Grand Jury Proceedings*

Petitioner next claims that his grand jury proceedings were tainted because the State lied to the grand jury; the State failed to turn over exculpatory evidence; the prosecutor

testified during the grand jury presentation; the indictment was secured by fraud on the court;

and the jury failed to act independently of the prosecutor.

In rejecting these claims on direct appeal, the intermediate state court of appeals found

as follows:

> [A]ppellant contends the trial court erred by denying appellant's motion to dismiss the indictment because it was based on improper grand-jury proceedings.  He suggests the grand jury 'failed to act independently of the prosecutor' because it did not conduct an adequate investigation and request exculpatory evidence and the prosecutor misled the grand jury by failing to present exculpatory evidence.
>
> In his original brief, appellant cites no record references to support this issue.  Indeed, we have no record of the entire grand-jury proceedings, from which to evaluate appellant's complaints.  The only portion of the proceedings in the record is appellant's testimony because it was admitted at trial.  We have no duty to pore through the 247–page transcript of appellant's testimony to verify his complaints.   In his reply brief, appellant cites two pages of this testimony.  However, in the referenced portion, grand jurors actually implored appellant to provide proof of his stop at the rest station, emphasizing such evidence would be significant toward establishing his alibi.  The grand jurors also indicated they planned to discuss obtaining additional evidence.  Accordingly, this isolated reference does not support appellant's contention the grand jury failed to obtain pertinent evidence or the prosecutor misled the grand jury.
>
> Further, appellant essentially challenges sufficiency of the evidence to support the indictment by suggesting the grand jury lacked adequate information.  A defendant may not challenge sufficiency of the evidence to support an indictment by grand jury.  An indictment returned by a legally constituted and unbiased grand jury, if valid on its face, mandates trial of the charge on the merits.

*Davis*, at *9–*10 (citations omitted).

Petitioner's continuation of his speculative and conclusory allegations in the instant

proceeding, without reference to any support in the record, fails to surmount his burden of

proof under the AEDPA standard of review.  Moreover, to the extent petitioner claims that

the State failed to present exculpatory evidence to the grand jury, the State carried no such

duty.  *See United States v. Williams*, 504 U.S. 36 (1992).

The state court denied relief on this claim.  Petitioner fails to show that the state

court's determination was contrary to, or involved an unreasonable application of, federal

law, or was an unreasonable determination of the facts based on the evidence in the record.

Respondent is entitled to summary judgment dismissal of this claim.

### *Counsel of Choice*

Petitioner asserts that he was denied his constitutional right to counsel of his choice

because the trial court erroneously found that his attorney had a conflict of interest.

In rejecting this argument on appeal, the intermediate state court of appeals held as

follows:

> [A]ppellant contends the trial court violated appellant's constitutional right to
> assistance of counsel by denying appellant's choice of counsel—his brother
> Marcus.  The State filed a pre-trial motion to disqualify Marcus on the grounds
> he was a material witness and his representation would prejudice the State.
> After hearing arguments, the trial court orally remarked that it granted the
> State's motion because, among several other reasons which the court did not
> specifically articulate, Marcus was a material alibi witness and would be
> placed in a 'very untenable position.'  Marcus had emphasized he was
> representing appellant *pro bono* because he could not afford other counsel.
> The trial court ensured that, if appellant filed a proper pauper's oath, it would
> immediately appoint an attorney experienced in defending cases of this level.
> The court did appoint other counsel.
>
> The Sixth Amendment right to assistance of counsel contemplates the right to
> counsel of a defendant's own choice, but this latter right is not absolute.  The
> strong presumption in favor of the right to counsel of choice may be

overridden by other important considerations relating to integrity of the judicial process and fair and orderly administration of justice. However, when a trial court unreasonably or arbitrarily interferes with a defendant's right to counsel of choice, its actions rise to the level of a constitutional violation. Therefore, courts must exercise caution in disqualifying a defense attorney, especially if less serious means would adequately protect the State's interests. In moving to disqualify a defendant's counsel of choice, the State bears a heavy burden of establishing that disqualification is justified.

In determining whether counsel should be disqualified because he is a potential witness, Texas courts utilize rule 3.08 of the Texas Disciplinary Rules of Professional Conduct as a guideline[:] '[a] lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client[.]' This rule does not prescribe the disqualification standard but provides considerations relevant to the determination. Counsel may be disqualified under the disciplinary rules when a party can demonstrate actual prejudice resulting from opposing counsel's service in the dual role of advocate-witness.

We review a trial court's decision on a request to disqualify defense counsel under an abuse-of-discretion standard. We defer to implied findings that are supported by the record. We uphold the ruling if it is correct on any theory of law, as long as the ruling lies within the zone of reasonable disagreement.

To support its motion for disqualification, the State presented two documents obtained by appellant with respect to other proceedings or pre-trial matters relative to the murder charge. First, the State presented a letter from a pathologist, whom appellant had requested to provide an opinion regarding the time of Leydis's death. According to this pathologist, the death occurred between Sunday morning and approximately 2:30 a.m. Monday morning. The State also presented Marcus's affidavit, in which he averred appellant was in the Dallas area from Friday evening before the murder until approximately 11:00–11:30 p.m. on Sunday night, effectively asserting appellant was in the Dallas area or traveling to Houston when Leydis was killed. Consequently, the trial court did not abuse its discretion by determining Marcus was a material alibi witness. Indeed, Marcus did testify at trial regarding appellant's presence in the Dallas area that weekend and the travel time and route from Dallas to Houston.

22

Consequently, if Marcus had served a dual role as counsel and witness, the State would have been prejudiced by the undue weight jurors might have assigned to Marcus's testimony and likely confusion during argument regarding whether Marcus was summarizing evidence or further testifying from personal knowledge. Marcus argued at the disqualification hearing, and appellant reiterates on appeal, that it was speculation Marcus would even testify and his testimony was not necessarily required because of other evidence placing appellant in the Dallas area at pertinent times. However, when a trial court considers a pre-trial disqualification motion based on a conflict of interest, some speculation is necessarily involved regarding whether counsel will actually serve a dual role and whether the dual role will result in actual prejudice to the State. Therefore, the presumption in favor of counsel of choice may be overcome by a showing of 'serious potential for conflict,' although the trial court's speculation cannot be 'unsupported or dubious.' In the present case, the State raised more than 'unsupported or dubious' speculation and demonstrated 'serious potential for conflict' because it was appellant who placed Marcus in the potential dual role as counsel and appellant's alibi witness.

Appellant suggests the trial court should have used less serious means than disqualification to protect the State's interests. It is unclear what alternative appellant proposes should have been utilized although he suggests the trial court could have ensured that Marcus not testify. However, the State demonstrated it would suffer actual prejudice even if Marcus did not testify. It was clear from the evidence at trial that appellant claimed he was in the Dallas area with Marcus or traveling home at the time of Leydis's death. Thus, even if Marcus did not testify, his personal knowledge might imply to the jury that his questions to witnesses regarding the alibi represented the truth, but the State could not clarify Marcus's 'testimony' through cross-examination or impeach his credibility. Accordingly, the record supports an implied finding that the State would suffer actual prejudice from Marcus's representation of appellant.

Even if the State had not met its burden, 'the trial court has an independent duty to ensure criminal defendants receive a fair trial that does not contravene the Sixth Amendment's central aim of providing effective assistance of counsel once issues are raised which indicate a concern.' The trial court could have determined that Marcus's dual role might prejudice appellant, especially if the State effectively impeached Marcus on the stand. Moreover, Marcus's detailed affidavit and the fact he was the relative with whom appellant stayed

23

in the Dallas area indicated Marcus was most knowledgeable about appellant's whereabouts over the weekend. Thus, the trial court could have determined that if Marcus remained as counsel with the proviso he not testify, appellant would be deprived of an essential alibi witness. Accordingly, the trial court did not abuse its discretion by ensuring appellant would have full benefit of all favorable witnesses while enjoying effective assistance of counsel.

*Davis*, at *10–*12 (citations omitted).

This Court has carefully reviewed the record and finds that the intermediate state court of appeals' determination is not contrary to, or involve an unreasonable application of, federal law, and is not an unreasonable determination of the facts based on the evidence in the record. To the contrary, the state court acknowledged and properly applied controlling federal law regarding petitioner's Sixth Amendment rights under the facts of the case. *See Wheat v. United States*, 486 U.S. 153, 158–60 (1988) (holding that a defendant's right to counsel of his own choice is not absolute and may be overridden by considerations relating to the integrity of the judicial process and the fair and orderly administration of justice). The Supreme Court in *Wheat* recognized that the presumption in favor of counsel of choice may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. *Id.*, at 163–64. Contrary to petitioner's argument, the record establishes that allowing Marcus to represent petitioner at trial carried a serious potential for conflict, not a speculative potential for conflict, for the reasons set forth by the intermediate state court of appeals. Petitioner's contention that the conflict of interest was purely speculative is both unpersuasive and refuted by the record.

The state court denied relief on this claim.  Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, federal law, or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

### *Investigative Statements*

Petitioner argues that the trial court erred in allowing into evidence statements he made during investigative interviews.  Specifically, he argues that he was actually under custodial arrest when he was driven to the sheriff's station, when he was interviewed at the station, and, later, when he was recorded at his house.  He further argues that his statements were inadmissible because he was under arrest when he made these statements and had not been "Mirandized."

The voluntariness and admissibility of petitioner's statements were the subject of a motion to suppress and suppression hearing.  To the extent petitioner directly or constructively raises a Fourth Amendment search and seizure argument, his claim is barred by *Stone v. Powell*, 428 U.S. 465, 494–95 (1976) ("[W]here the State has provided an opportunity for a full and fair litigation of the Fourth Amendment claim, the Constitution does not require that a state prisoner be granted habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.").

In rejecting the merits of petitioner's claims, the intermediate state appellate court found as follows:

[A]ppellant suggests the trial court erred by denying appellant's motion to suppress (1) his statements to Sergeant Palacios while traveling to the homicide office, (2) appellant's interview at the office, and (3) his statements at his home approximately four months after the murder.

We must uphold the denial of a motion to suppress if it is reasonably supported by the record and is correct under any applicable theory of law. We will reverse only if the ruling is outside the zone of reasonable disagreement. When, as in the present case, a trial court enters findings of fact after denying a motion to suppress, we first determine whether the evidence, viewed in the light most favorable to the trial court's ruling, supports these fact findings. We give almost total deference to the trial court's finding of historical facts and determinations on 'mixed questions of law and fact' that depend on credibility of witnesses. We review de novo pure questions of law and 'mixed questions of law and fact' that do not depend on credibility determinations. During a hearing on a motion to suppress, the trial court is the sole judge of witness credibility and the weight to give their testimony.

A.     Applicable Law and Standard of Review

Appellant generally cites Texas Code of Criminal Procedure article 38.21, which provides, '[a] statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion under the rules hereafter prescribed.' Appellant then seems to rely on both federal constitutional law and Texas Code of Criminal Procedure article 38.22 by suggesting (1) the statements were inadmissible because appellant was in custody but officers failed to give the *Miranda*/statutory warnings, deprived him of the right to counsel, and did not properly record the statements, and (2) the statements were generally involuntary.

In *Miranda v. Arizona,* the United States Supreme Court held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' These safeguards are codified in article 38.22 of the Texas Code of Criminal Procedure. Article 38.22, section 3(a) provides that no oral statement of an accused 'made as a result of custodial interrogation' shall be admissible against him in a criminal proceeding unless an electronic recording satisfying certain requisites is made of the statement, the accused is given the *Miranda* warnings and one additional warning prescribed in article 38.22, and

26

the accused knowingly, intelligently, and voluntarily waives the rights set out in the warnings.

The *Miranda* and article 38.22, section 3(a) safeguards apply only to custodial interrogation.  Contrary to appellant's suggestion, he had not been formally arrested before any statements at issue.  Thus, the 'custody' inquiry involved determining whether 'under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest.'  The 'custody' determination must be made on a case-by-case basis considering all objective circumstances.  Subjective intent of law enforcement officials to arrest is irrelevant unless that intent is somehow communicated or otherwise manifested to the suspect.  Additionally, station-house questioning does not automatically constitute custody.  The defendant bears the initial burden of proving that a statement was the product of 'custodial interrogation.'  In the present case, the trial court made written findings supporting its conclusion that appellant was not in custody when he made all the statements at issue.

Although appellant does not cite the specific provision, he apparently also invokes the general voluntariness statute—Texas Code of Criminal Procedure article 38.22, section 6.  Section 6 applies to both an accused's custodial and non-custodial statements because it provides that only 'voluntary' statements may be admitted.  If the defendant produces evidence of involuntariness, the State must prove by a preponderance of the evidence that the defendant's statement was voluntary.  Additionally, if an accused raises a question as to voluntariness of his statement, the court 'must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions' and 'enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based[.]'  In the present case, the trial court made written findings supporting its conclusion that all the statements at issue were voluntary.

B.    Analysis

To support his complaint that his statements were the product of custodial interrogation and involuntary, appellant generally asserts he was 'deprived of his only means of communicating with his attorney, handcuffed, placed in the back of a patrol car, detained by officers, and finally forced to accompany Sgt. Palacios to his 'office' without shoes, currency, identification, or access to

communication with any party not under control of the [sheriff's department] for a combined approximately 10.5 hours' and Sergeant Palacios exercised 'brute force.'   However, the State's evidence proffered at the suppression hearing contradicted some of the facts cited above by appellant.  Even the facts cited by appellant which are supported by the record did not support a finding he was in custody or his statements were involuntary.

1.      Statements while traveling to the homicide office

Although appellant did not seek to suppress his statements to the first responding officer, Deputy Katrib, appellant nevertheless suggests Deputy Katrib's actions at the scene demonstrated appellant was denied his right to counsel and was in custody throughout the day.  Appellant apparently refers to Deputy Katrib's actions while appellant was speaking by telephone to Marcus.  At the suppression hearing, Deputy Katrib testified that he requested appellant to 'kindly' cooperate and terminate the telephone conversation as soon as possible so that officers could bag his hands, to preserve any gunshot residue.  We conclude Deputy Katrib's request did not constitute a deprivation of any right to counsel, simply because Marcus happened to be an attorney.  Instead, Deputy Katrib testified that appellant never invoked any right to counsel during their interaction.

Appellant also suggests the fact he was handcuffed and placed in the back of a patrol car at the scene demonstrated he was under arrest at the scene and during his subsequent statements that day.  However, Deputy Katrib testified appellant was handcuffed solely to hold the bags in place—not because he was under arrest; another officer then placed appellant in the back of a patrol car—again not because he was under arrest, but consistent with standard procedure of separating witnesses and keeping them in a contained environment.

Significantly, the first statements that appellant sought to suppress were made while traveling to the homicide office in Sergeant Palacios's vehicle— after the handcuffs were removed.  Sergeant Palacios testified appellant was not under arrest during the ride.   At the suppression hearing, appellant acknowledged he rode in the front seat and was not handcuffed.  Nonetheless, appellant testified he refused to go to the homicide office but Sergeant Palacios was 'adamant' it was 'not an option' and his conduct indicated appellant was under arrest.  However, the trial court was free to believe Sergeant Palacios's testimony that appellant willingly accompanied him to the

office.  Indeed, the trial court rendered findings that both Deputy Katrib and Sergeant Palacios gave credible testimony regarding all their interactions with appellant that day and appellant did not give credible testimony.

Sergeant Palacios further testified, and the recording confirms, the interaction during the ride was conversational; appellant even assisted Sergeant Palacios with directions.  The entire conversation was not recorded because the tape became full at some point.  Regardless, in light of Sergeant Palacios's testimony, the trial court was free to believe that the nature of the interaction during the unrecorded portion was consistent with the nature of the interaction during the recorded portion.

Sergeant Palacios acknowledged that appellant did not have his shoes, cell phone, or wallet during the ride.  Appellant requested his shoes, which were in his car, but Sergeant Palacios did not comply in order to avoid disturbing the crime scene.  However, Sergeant Palacios retrieved appellant's jacket because of the cold weather.  We conclude the fact that appellant lacked the other items did not transform his decision to accompany Sergeant Palacios to the homicide office into a custody situation or indicate his statements were involuntary.

Instead, the evidence supports the trial court's findings that appellant was not under arrest either before or during the ride to the homicide office, he was 'free to go at any time,' he did not fear he was under arrest, he was not 'coerced' or 'hassled,' his encounter with Sergeant Palacios was 'consensual,' and he freely and voluntarily spoke with Sergeant Palacios.  Accordingly, based on all the circumstances, the trial court did not err by concluding a reasonable person would not believe 'his freedom of movement was restrained to the degree associated with a formal arrest' during the ride and appellant's statements were voluntary.

### 2.    Interview at the homicide office

The next statement appellant sought to suppress was his interview by Sergeants Palacios and Clegg at the homicide office.  Sergeant Palacios testified as follows regarding events at the office:  when they arrived, appellant was given an opportunity to use the restroom and have a drink, which he accepted; Sergeant Palacios then placed appellant in as interview room, where he waited thirty to forty-five minutes while Sergeant Palacios briefed Sergeant Clegg on this matter and an unrelated case; during his time at the office, appellant was not under arrest and could have left if he had asked; at some

29

point, Sergeant Palacios offered appellant the opportunity to take a polygraph test, which appellant accepted, and Sergeant Palacios then returned appellant to the interview room; before the polygraph test, appellant asked for an opportunity to speak with Marcus, which the officers allowed, but appellant never invoked his right to have an attorney present during the interview; subsequently, there was a time period when appellant was alone in the interview room, was free to come and go, and did leave the room several times; the officers did not threaten, coerce, promise anything to, or 'lay a hand on' appellant, and he spoke with them voluntarily, even after he became agitated; and later, appellant expressed his wish to terminate the interview and was allowed to leave.

In contrast, at the suppression hearing, appellant described the interaction as follows:  he was essentially locked in the interview room from 9:30 a.m. to 4:00 p.m. and felt he was not free to leave; he said 'a couple of times' that he did not wish to speak with the officers; they prevented him from using a phone although he requested an opportunity to speak with Marcus, including before the polygraph test; the officers seemed 'offended' that appellant asked to speak with an attorney; at 4:00 p.m., appellant insisted Sergeant Palacios take him home, but the officer refused; appellant yelled out to a lobby where other persons were gathered that he had been there all day and was prohibited from using a phone or contacting an attorney; Sergeant Palacios was irritated by this action and threatened to arrest appellant for trespassing; another officer escorted appellant out of the building; and appellant was able to 'escape' only by embarrassing Sergeant Palacios in this manner.

However, the trial court was free to believe Sergeant Palacios's testimony. Moreover, the recording of the interview confirms Sergeant Palacios's account and further demonstrates that, at the outset of the interview, the officers informed appellant he was not under arrest and they merely wished to obtain a statement.  We recognize the entire interview was not recorded because, apparently unbeknownst to the officers, the equipment was deactivated at some point.  Appellant testified that during the unrecorded portion, the officers were 'menacing' as though they planned to 'fight' appellant and said he could not leave 'without going through' them.  However, in light of Sergeant Palacios's testimony, the trial court was again free to believe that the officers' demeanor and behavior toward appellant during the unrecorded portion were consistent with their demeanor and behavior during the recorded portion.

Therefore, the evidence again supports the trial court's findings that appellant was not under arrest during the interview at the homicide office, he was 'free to go at any time,' he did not fear he was under arrest, he was not 'coerced' or 'hassled,' the encounter was 'consensual,' and he freely and voluntarily spoke with the officers.  Accordingly, based on all the circumstances, the trial court did not err by concluding a reasonable person would not believe 'his freedom of movement was restrained to the degree associated with a formal arrest' during the interview and appellant's statements were voluntary.

Appellant also suggests Sergeant Palacios acted in 'bad faith' by deliberately destroying portions of recordings made in his car and at the homicide office. However, appellant cites no instance where he raised this 'bad faith' claim in the trial court.  Nevertheless, there is no evidence Sergeant Palacios destroyed recordings; rather, as mentioned above, these encounters were not entirely recorded in the first place.

Finally, in his sixth issue, appellant presents two additional grounds for exclusion of his statements in the car and at the homicide office:  they constituted testimony from appellant although he did not testify at trial; and the trial court failed to redact portions constituting evidence of extraneous offenses.  However, appellant does not cite any authority prohibiting admission of an appellant's out-of-court statement for the sole reason that he does not testify at trial.   Further, appellant has waived his complaint regarding admission of extraneous offenses by failing to identify any portions of his statements which were allegedly inadmissible on this ground, much less cite an instance in which he objected on this ground; again, we have no duty to pore through both statements to attempt to discern his complaint.

### 3.    Statements at appellant's home

Appellant also sought to suppress the statements made at his home on April 1, 2009—approximately four months after Leydis's death.  However, on appeal, appellant merely asserts that admission of the recording violated the Texas Code of Criminal Procedure because appellant's counsel was not 'consult[ed]' and appellant was not given *Miranda* warnings.  Appellant fails to cite any facts or present argument showing the encounter was a custodial interrogation and thus *Miranda* warnings were required.  Nevertheless, at the suppression hearing, Sergeant Clopton testified, and the recording confirms, that appellant invited the officers to his home, appellant was not under arrest or physically restrained, officers did not threaten, coerce, or promise anything to appellant,

the interaction was cordial, and appellant's children were even present.  The trial court rendered a finding that Sergeant Clopton was credible.  Therefore, the evidence again supports the trial court's findings that appellant was not under arrest during the encounter at his home and it was consensual. [FN5] Accordingly, based on all the circumstances, the trial court did not err by concluding a reasonable person would not believe 'his freedom of movement was restrained to the degree associated with a formal arrest' during the encounter at appellant's home and his statements were voluntary.  Finally, appellant also fails to cite any authority demonstrating officers were required to consult appellant's attorney, and Sergeant Clopton testified appellant never invoked any right to counsel during the encounter.

> FN5.  In its findings, the trial court referred to the first interview at appellant's home as occurring on May 1, 2009 when it actually occurred on April 1, 2009.  Nonetheless, we construe the court's finding as applicable to the encounter on April 1, 2009 because it is undisputed the first interview at appellant's home occurred that day, and the 're-interview[ ]' on May 28, 2009 referenced in the court findings was Sergeant Clopton's return visit to collect the casing appellant had found.

*Davis*, at *12–*17 (citations omitted).

The procedural safeguards set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966), protect an accused's Fifth Amendment privilege against self-incrimination during custodial interrogation.  *Gachot v. Stadler*, 298 F.3d 414, 418 (5th Cir. 2002).  Consequently, a defendant who gives a statement to law enforcement officials in a non-custodial situation need not be advised of his *Miranda* rights.  *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *Wilson v. Cain*, 641 F.3d 96, 101 (5th Cir. 2011).

Respondent sets forth the proper governing federal law in his motion for summary judgment.  (Docket Entry No. 52, pp. 25–26.)  A suspect is "in custodial interrogation" for purposes of *Miranda* "when placed under formal arrest or when a reasonable person in the

suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id*. at 100–01. Whether a person is "in custody" for purposes of *Miranda* is determined by the objective circumstances of the particular interrogation at issue. *Id*. at 101. "Two discrete inquires are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. ___, 131 S. Ct. 2394, 2402 (2011).

In the instant case, the record shows, and the trial court found, that petitioner was not in custody when he made the three statements. The officers' testimony showed that petitioner was not handcuffed, and that he rode to the police station in the front seat of the police car. He could have left at any time during the interview, and was released when he declared he was done with the interview. He did not request an attorney and was allowed to call his brother, Marcus, when he later asked to speak to one. The interrogators believed petitioner gave the statements voluntarily and that he was not in custody.

Petitioner's complaints that the officers' versions of the interrogations directly contradicted his own testimony afford him no basis for habeas relief. The trial court, sitting as the fact finder for purposes of the suppression hearing, weighed the evidence, made credibility determinations regarding the conflicting testimony, and found the police officers' testimony credible and petitioner's testimony not credible. It was well within the trial court's

33

discretion to believe the officers' testimony and disbelieve petitioner's testimony, as would have been a decision to disbelieve the police officers' testimony and believe petitioner's testimony.

The state court denied relief on this claim. Petitioner's disagreement with the trial court's findings and ruling is insufficient to meet his burden under the AEDPA standard of review. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, federal law, or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

### *Trial Court Error*

Petitioner contends that the trial court failed to exclude the grand jury record; failed to "control" the State's closing arguments; failed to grant a directed verdict; failed to exclude audio and video evidence, thereby forcing petitioner to testify against himself; failed to exclude hearsay evidence; and failed to prevent the prosecution from misrepresenting the testimony of witnesses.

In rejecting petitioner's claims of trial court error, the intermediate state court of appeals held as follows:

> Finally, we address the remaining contentions in appellant's sixth issue that do not overlap with previous issues.
>
> Appellant argues the trial court erred by admitting the recording and transcript of appellant's grand-jury testimony and allowing the recording to be played for the jury. However, appellant failed to preserve error because he expressly

34

represented, 'We have no objection' when the State proffered the tape and transcript during trial.

Next, appellant contends the trial court allowed 'incompetent' evidence to be read to the jurors absent a disagreement concerning the testimony. However, the sole instance during deliberations in which the trial court instructed the court reporter to read certain testimony occurred in response to the jury's note that there was a disagreement concerning the testimony.

Finally, appellant's remaining complaints are bare contentions that the trial court failed to (1) limit voir dire to 'general' rather than 'case specific' questions, (2) 'control and excuse' panel members who were 'disruptive and prejudicial,' (3) rule on all motions, and (4) compel the State 'to produce all evidence.' These contentions are far too general to present any complaint for our review, considering voir dire consisted of ninety pages of reporter's record, appellant filed a myriad of pre-trial motions, and the State possessed voluminous evidence. Appellant has waived these arguments by failing to identify the specific instances of which he complains or provide supporting authority.

*Davis*, at *18–19 (citations omitted).

Respondent correctly argues that some of petitioner's arguments were not raised on appeal, are unexhausted, and are now procedurally barred from consideration by this Court. Nevertheless, the Court will address all of petitioner's claims as none has merit.

The record shows that petitioner did not object to the admission of his grand jury testimony; to the contrary, petitioner explicitly stated that he had no objections. The Texas contemporaneous objection rule therefore precludes review of this claim. *See Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007) (holding that the Texas contemporaneous objection rule is "an adequate procedural bar"). Petitioner fails to present good cause for his procedural default. *See Coleman v. Thompson,* 501 U.S. 722, 735 n.1 (1991).

Petitioner further fails to provide controlling federal law supporting his argument that the trial court was under a duty to "control" or otherwise object, *sua sponte*, to the State's closing argument, nor does he direct the Court to any clear prejudicial error occurring during closing argument.

Nor is petitioner entitled to habeas relief based on the trial court's denial of a directed verdict. Petitioner's claim is the equivalent of a challenge to the sufficiency of the evidence. *See Gartrell v. Lynaugh*, 833 F.2d 527, 528 (5th Cir. 1987) ("[C]laims that the trial court erred by denying his motions for directed verdicts merely state in different words his claims that the evidence is insufficient to support the convictions."). This Court has already denied petitioner's challenge to the sufficiency of the evidence, and no error is shown.

The factual basis for petitioner's claims regarding "audio and video evidence" is not entirely clear; however, the Court believes petitioner is complaining of the trial court's admission of his recorded statements made to investigators. The Court has already rejected petitioner's arguments regarding his recorded investigative statements, and no error is shown. To the extent petitioner is re-urging his challenge to the admission of his grand jury testimony, this Court has already rejected the claim pursuant to the contemporaneous objection rule.

The contemporaneous objection rule also bars consideration of petitioner's complaint regarding admission of complainant's hearsay statement that petitioner had assaulted her. Petitioner raised no objection at trial, and he fails here to support his argument that the trial

court was under a duty to exclude, *sua sponte*, the evidence as hearsay and/or extraneous offense evidence.  Petitioner fails to present good cause for his procedural default.  *See Coleman*, 501 U.S. at 735 n.1.

Petitioner fares no better in claiming that the trial court failed to "prevent" the State from deliberately misrepresenting testimony during closing argument.  Petitioner fails to direct the Court to any portion of the record evincing deliberate misrepresentations of the evidence during closing argument.  Nor does petitioner cite any controlling federal authority supporting his position that it was the trial court's responsibility – as opposed to his own attorney's responsibility – to monitor the State's closing argument and "prevent" inconsistencies.  Petitioner's unsupported arguments and conclusory allegations afford him no basis for federal habeas relief.

The state court denied relief on the exhausted claims.  Petitioner's disagreement with the state court's findings and rulings is insufficient to meet his burden under the AEDPA standard of review.  Petitioner fails to show that the state court's determinations were contrary to, or involved an unreasonable application of, federal law, or were unreasonable determinations of the facts based on the evidence in the record.  Petitioner further fails to establish entitlement to federal habeas relief as to his unexhausted claims.  Respondent is entitled to summary judgment dismissal of petitioner's claims.

### *Prosecutorial Errors*

Petitioner complains that the prosecution erred in introducing "out-of-record" arguments as evidence, including vouching for the credibility of witnesses, shifting the burden of proof, lying to the jury, arguing that the defense was lying, and stating that petitioner and another witness were liars.

In rejecting petitioner's claims of prosecutorial error, the intermediate state court of appeals held as follows:

[A]ppellant contends the prosecutor committed various acts of misconduct.

First, appellant contends that, during closing argument, the prosecutor misstated testimony from the State's DNA witness. Although appellant fails to cite any record references, we noted only one instance during closing argument in which appellant objected to the prosecutor's citation of DNA evidence. The prosecutor remarked that DNA under Leydis's fingernails 'wasn't a combination of Leydis and [appellant] and their kids and some unknown person. Uh-uh. It was combination of Leydis and [appellant].' Appellant objected that the prosecutor misstated evidence because the State's DNA expert could not exclude the couple's sons as contributors. However, appellant failed to preserve error because he did not obtain a ruling on the objection or object to the lack of a ruling. The trial court simply responded, 'The jury will recall the evidence.' Appellant asserts the trial court sustained the objection but failed to give an instruction to disregard. To the extent the court's response may be construed as sustaining the objection, appellant did not preserve his further complaint because he failed to request an instruction to disregard and thus obtained all relief requested.

Appellant also argues the prosecutor misstated DNA evidence when responding to appellant's motion for instructed verdict. Appellant again failed to preserve error via an objection. Nonetheless, any misstatement was harmless because it was made outside the jury's presence and could not have influenced its verdict.

Next, appellant posits that the prosecutor prejudiced appellant during voir dire by incorrectly referring to the charge as a 'domestic violence case.' Appellant advances a similar complaint in his sixth issue by contending the trial court permitted such purportedly false statements. Appellant fails to cite record references, much less any instances in which he preserved error by objecting to the statements. Regardless, the State presented evidence appellant committed domestic violence and Leydis's murder resulted from such conduct. Therefore, the prosecutor did not commit misconduct by inquiring, for purposes of obtaining a fair and impartial jury, whether panel members might be influenced by the domestic-violence aspect.

Finally, appellant complains the prosecutor mentioned a federal suit filed by appellant against Harris County and improperly indicated it was dismissed for lack of merit. Although, once again, appellant cites no record references, we noted while reviewing the State's cross-examination of Marcus, that the State elicited testimony appellant filed a federal suit against several officers relative to the murder investigation but Marcus was unaware the court had dismissed the suit. During closing argument, the prosecutor asserted appellant filed a federal suit in order to curtail the murder investigation and the court dismissed the suit. However, appellant failed to preserve error on his contention because he did not object to the State's questions or closing argument.

*Davis*, \*17–18 (citations omitted).

The overwhelming majority of petitioner's complaints were waived by the contemporaneous objection rule due to his failure to object at trial. Nor did petitioner request the trial court to instruct the jury to disregard any particular evidence. Moreover, he failed to raise as an issue on direct appeal any complaint that the State characterized petitioner, his lawyer, or any witness as "liars," and these claims are now procedurally barred. Petitioner fails to present good cause for his procedural default. *See Coleman,* 501 U.S. at 735 n.1.

Regardless, the claim is without merit. As correctly noted by respondent, in addressing a miscarriage of justice claim based on prosecutorial misconduct, the court looks

to two factors:  whether the State made an improper remark, and whether the defendant was prejudiced.  *United States v. Stephens*, 571 F.3d 401, 408 (5th Cir. 2009). A review of petitioner's and the State's closing arguments shows, in relevant part, the following:

> DEFENSE COUNSEL:     [The investigating officers] knew exactly where [petitioner] was.  They knew exactly what he had done.  *And they knew he was exactly telling them the truth*.  They knew it.  They knew it.  They had the barbeque place that he went to.  They had the receipt.  They had the Lowe's receipt.  Central Expressway; they had the receipt.
>
> *This man [petitioner] could not have told them anything other than the truth*, which was what he was telling them and they knew it because they had proof of it.

R.R., Vol. 15, p. 106 (emphasis added).   In response, the State argued as follows:

> THE STATE:       Anthony Norman wouldn't know the truth if it came up and slapped him in the face, and he has shown that at every single turn of this case. . . . And yet he wants you to believe . . . that he is above reproach; that he is a hundred percent truthful about absolutely everything and poor, little, innocent Anthony Norman, everybody is picking on me.  Sergeant Palacios was mean to me.  Sergeant Palacios falsely arrested me.
>
> *      *      *      *
>
> [N]ot only is Anthony Norman a liar, Marcus Norman is a liar; and that all they want to do is cast blame somewhere other than at Anthony Norman.
>
> *      *      *      *
>
> [T]he one thing that we do know is there's only two people who know what happened in that house 100 percent all of the details.  That's Leydis Norman, and she can't tell you because she can't talk from the grave.  And it's Anthony Norman, and he won't tell you because he's a liar.
>
> *      *      *      *

40

> And you consider Anthony Norman and whether or not he tells the truth, think about all of the things he's lied about.  Not even stuff that mattered in this case.  About the guns and Mary Ortiz; about the TVs and Mary Ortiz; about the diaper.  You know all sorts of things.  He just makes stuff up whenever he feels like it.  He doesn't even know the truth anymore.

*Id.*, pp. 114–15, 116, 119, 134.

Petitioner argued during closing argument that he told the police investigators the truth regarding his alibi, and that he "could not have told them anything other than the truth." Petitioner's argument allowed the State to then argue that petitioner was not truthful, that he was a liar, and that he was lying about the events surrounding his wife's death.  Petitioner's alibi depended on the jury seeing him as a credible, truthful person; his argument that he was truthful invited the State to argue that petitioner was not credible and truthful.  *See United States v. Tullos*, 868 F.2d 689, 697 (5th Cir. 1989) ("The defendant's comments clearly invited the prosecutor's reply.").  The prosecutor discussed at length during closing argument the inconsistencies in petitioner's statements of what he did upon finding his wife's body; the prosecutor characterized petitioner as a liar based on the record, not personal opinion. Accordingly, the prosecutor did not err by referring to petitioner as a liar during closing argument.  Inasmuch as petitioner's brother Marcus backed up petitioner's alibi, the State did not err by arguing that Marcus was also lying.

Petitioner additionally claims that the State attempted to shift the burden of proof onto him.  Petitioner failed to raise this issue on direct appeal and the claim is now procedurally barred.  Petitioner fails to present good cause for his procedural default.  *See Coleman*, 501

41

U.S. at 735 n.1.  Regardless, the claim lacks merit.  The trial court properly charged the jury with the appropriate burden of proof.  C.R. Vol. 4, p. 924 ("The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant.").  Juries are presumed to follow their instructions, and petitioner presents no probative summary judgment evidence rebutting the presumption.  *See Richardson v. Marsh*, 481 U.S. 200, 209 (1987).  Habeas relief is unwarranted.

The state court denied relief on the exhausted claims.  Petitioner's disagreement with the state court's findings and rulings is insufficient to meet his burden under the AEDPA standard of review.  Petitioner fails to show that the state court's determinations were contrary to, or involved an unreasonable application of, federal law, or were unreasonable determinations of the facts based on the evidence in the record.  Petitioner further fails to establish entitlement to federal habeas relief as to his unexhausted claims.  Respondent is entitled to summary judgment dismissal of petitioner's claims.

### *Conclusion*

Respondent's motion for summary judgment (Docket Entry No. 52) is GRANTED and this lawsuit is DISMISSED WITH PREJUDICE. Petitioner's cross motions for summary judgment (Docket Entries No. 60, 67, 69, 71) are DENIED. A certificate of appealability is DENIED. Any and all pending motions are DENIED AS MOOT.

Signed at Houston, Texas on December 11, 2013.

Gray H. Miller
United States District Judge

43